Steve Hubachek, Federal Defenders, on behalf of Mr. Vizcarra-Pardini. Your Honors, the question here revolves around the closing argument in which the government effectively indicated that Mr. Vizcarra was guilty because he didn't call a particular witness, Carla Magdalena Garcia Moreno. I think that argument was improper and it was kindly objected to for a number of reasons. First, I understand that this Court's decision in Cabrera says that it's okay for the government to bring up an absent witness if there's no Fifth Amendment implications and that doesn't shift the burden. But this is a completely different case than Cabrera, and there's three reasons why that's the case. Number one, this Court in the Geis or Geis case, I don't know precisely how to pronounce it, held that it's improper to make that kind of argument if the witness is not someone who's peculiarly within the power of a particular party. Carla Garcia Moreno is a person in the Republic of Mexico. We had no subpoena power over her. It was impossible for us to subpoena her to bring her to trial, and it was impossible to cajole her to come to trial because the whole point of the defense was to blame her. So what the government did was they equated guilt with the failure to call a witness that we couldn't possibly have called. That's point number one. And I think that this Court's decision in NOAA also supports that point. It says that when you're going to make a missing witness type argument like that, the district court needs to make a finding that you are within the power of the individual or produce. And I think that there's two Williams cases floating around here. The Williams case from the Seventh Circuit says exactly the same thing as NOAA. So what we have here is equating guilt with the failure to produce a witness that was completely beyond the subpoena power of the defense. That's reason number one that Cabrera is distinguishable. Reason number two that Cabrera is distinguishable is that the argument effectively told the jurors to put themselves into Mr. Vizcarra's situation and to consider what they would have done under those circumstances. And that is contrary to these golden rule cases that are cited in the briefs. I think the most relevant case is Tessleem, which is really the, I think, the most clear statement that the golden rule doctrine applies in the context of criminal cases. And Tessleem is a case from the Seventh Circuit. I don't think anyone's criticized that case or disagreed with it. I think that this Circuit's cases are open on that point. I don't think this Court has ever addressed the particular issue as to whether or not that's a proper or improper argument. But again, we have effectively shifting the burden, telling the jurors not to consider the evidence in the case or not to consider Mr. Vizcarra's situation, but instead to decide what they would have done with their own views of their own rectitude and how brave they would have been or how cooperative they would have been. The third reason that I think that the Cabrera case doesn't hurt us is I think that this argument really does implicate the Fifth Amendment. Now, I understand that Mr. Vizcarra testified at trial. So that type of argument is unavailable to us, but that's not the only Fifth Amendment interest at stake here. We have an argument, and the way that it starts at page 603 of the excerpt of record is the prosecutor says, where in the heck is Carla Magdalena Garcia Moreno? So there's no question that the point of this whole argument is the defense did not produce this witness. Then he goes on to say that what are the things that the jurors would have done if they were in Mr. Vizcarra's point? They would have called family members. They would have done this. They would have done that. All these things implicate the Fifth Amendment. You know, from the point that Mr. Vizcarra was arrested up to the point of this trial, apparently, according to government, he should have been volunteering this information to the government. He has a Fifth Amendment right not to do that. He has a Fifth Amendment right not to demonstrate that he has a closer connection with Carla Garcia Moreno. He has a Fifth Amendment right not to assist the government in the preparation of their case. So I think that this argument clearly does implicate Fifth Amendment interests, even if those Fifth Amendment interests are not precisely the interest in your trial testimony. And, you know, this Court's decision in Williams, which I think is cited by both parties, 990 Fed Second at 510, broadly describes the Fifth Amendment interest, saying that none of these meanings actually changes the burden unless the prosecutor's comment uses the defendant's Fifth Amendment privilege as evidence against him. Well, the evidence against Mr. Vizcarra, according to this argument, is his failure to volunteer this information. So I think that clearly implicates the Fifth Amendment from the day that he was arrested all the way up to the time that he was actually in trial. It's also important to bear in mind that the record makes clear that the government never asked him to help them find Carla Magdalena Garcia Moreno. And that's at page 436 to 437. Agent Conrad said that she never asked. All right, counsel, suppose we agree with you on the law, that it was improper and the judge's overruling the objection was error. Why isn't this harmless error? This isn't harmless error for a number of reasons. First, I think that because it does implicate the Fifth Amendment and the burden of proof, we're talking about the constitutional standard. That was the standard set out in our opening brief. And I don't think the government ever really disputed that that was the appropriate standard. But if they had, I think that the Velarde-Gomez, I think, case, I'll put that in the 28J, indicates that you apply the beyond a reasonable doubt burden of proof to constitutional errors and reversed in that case. But I think this is one of the better, from the defense perspective, border bus cases that I've seen. If you look at the evidence here, you've got a guy claiming that he was given the car by somebody, he was sent on an errand, and he was going to a particular place. And unlike a lot of these cases where you just have the defendant's testimony, they actually brought in his uncle, who was the owner of the car shop, and he testified, yes, I did send him on the errand. Mr. Vizcarra's testimony was that he picked up the car at Burger King from his girlfriend, Carla. He brought in his cousin to testify. And that cousin testified, yes, he does have a girlfriend named Carla, and I drove him to the Burger King to meet with her. And in addition to that, you also have the owner of the car parts store on the U.S. side of the border coming in to testify that I know the shop owner, and I do sell that guy parts. So what we have here is substantial corroboration. And this is basically a case that's a swearing match. If the defense is believed, then they're going to acquit. If the government is believed, then they're not. So I think that in this kind of case that's so close, it doesn't really matter what harmless error standard you apply. This is a strong case for the defense, and I don't think there's any way that this type of argument that goes directly to constitutional rights could possibly be harmless under those circumstances because of the unusually strong nature of the defense case. Let me ask you a question moving to your Blakely-Booker argument. How much time is remaining on his sentence? Your Honor, I really don't think that he has a lot of time left. I looked in the ‑‑ I think it was a relatively short sentence. It was. Yeah. I'm pinch-hitting on this one, so I'm not ‑‑ his projected release date, it says, was July 27th, 2004. So I don't think that ‑‑ He's out. He's out. If he's out, is his case moot? I don't think it's necessarily moot because of the implications on the imposition of supervised release. You know, there may be discretion there. But I think Your Honor should concentrate on the merits of the conviction here. Because I ‑‑ Well, my concern is that, is whether we would remand this for resentencing if there was now, as opposed to waiting for whatever is going to happen with Ameline, et cetera. Your Honor, it may be that he can't get less than two years of supervised release. And I frankly don't know the answer to that question because there are mandatories in the drug statute. I could look into that and maybe we can even agree as to whether or not he could get less. But I would hate to have the case held up for that because, you know, the bottom line is that he can't get a lower sentence because he's already been released. Unless Your Honor has any more questions, I'll reserve. You're right. Thank you. Lawyer honors, my name is Richard Chang. I'm the Assistant United States Attorney and trial counsel on this particular case. Let me first address the issue regarding this person's release status. Mr. Viscar Pardini was released back in July. He has been deported, which implicates essentially whether, in fact, a remand would be moot or not. Certainly, he has done his 15-month sentence. He was sentenced also to a term of two years of supervised release. That is the lowest amount of supervised release available for this type of crime. Let me now move on to the question that Your Honor had regarding error, whether there was error or whether it was even harmless error in this instance. Certainly, it should be noted and we agree that the government talked about Carla Magdalena Garcia Moreno. And we talked about that individual because that was their defense, that this person had set him up, that he knew nothing about the drugs. Certainly, we addressed that. But I should say, before I reread the transcript, I would have said to myself, and possibly the Court has said it now in their mind when they reviewed the transcript, that it was all about Carla Magdalena Garcia Moreno, when, in fact, it wasn't. This is a case about his story. It's a case about what he said not only at the time that he testified, but also at the time that he was arrested. And look at the story. Look at the basis of the government's case before any mention at all regarding the girlfriend. From pages 483 to 498, 498 being the first time the government even mentioned the name Carla, we spoke about what was the problem in their defense case, which is that he kept changing his story. When he was at the primary inspection location, he says he's coming over to buy auto parts, a specific auto part for his car. When he is confronted with that statement, you know, you don't have a Honda, do you? He doesn't have a Honda. He's buying for a Honda car, a car that he doesn't have. Then he says, well, it's for a particular type of car. It's for a reflective quarter, not rear lights, but a reflective quarter. Well, we find out how much of a problem that is. Ginsburg. Wasn't there an issue about the interpretation of the language? Absolutely. There was a – but whether it was interpreted correctly or not, the focus of the government's argument at closing was not what the determination of that particular part was, but what was his reaction when confronted? The agent confronted him with, well, you know, this part that you've been saying that you were going to buy that day. I just called, and it's going to cost 50-something dollars. You only have $20 in your pocket. So what does he do? The reaction is what the government pointed at. Oh, no. I didn't mean buy the part in the same manner. I didn't mean it was for my car. I was going to price the part. And that's what we – the government did from pages 43 to 498 in the argument, that, you know, look at the story. When he's confronted with something, it was all about the reaction that the government wanted to talk about. It was what was reasonable. And as we talk about that, Mr. Hubachek started with, well, the crux of this particular case and this argument is what the government did in terms of either changing or shifting the burden and invoking the Golden Rule or violating the Golden Rule. Well, time and time again, this Court as well as other courts have said, you know, the government has the ability to point out weaknesses and holes in the defense  That's exactly what we did. Certainly, if Carla Magdalena was supposedly this monoharry that set this person up without him knowing about it, certainly that is a person that is uniquely in the – not the bed, necessarily, but certainly in the, I guess, position of being closely akin to the defendant, romantically involved with the defendant, a person that supposedly the defendant knows, knows well, and more importantly, would have access to. In the same manner that Mr. Hubachek says, well, you know, we don't, meaning the defendant doesn't have subpoena powers, the government doesn't have subpoena powers either. We – the only bit of information that we were left with, quite frankly, was a registration document, a Mexican registration document that had an address on it, an address that the defendant didn't know about, an address that he didn't remember, an address that he didn't have. The only thing that he had, we asked him, where does she live? I don't know. Well, how do you get a hold of her? I have a cell phone. Do you have a cell – do you have a telephone for her home? No. Well, where's her cell phone? Well, it's a number I have in Mexicali. That was six to eight months before the trial itself, when he was essentially arrested and questioned. Eight months later, when he's testifying, he still doesn't have that answer, because we go through the same rendition of, hey, you know, who is this person? What does she look like? And as we're talking about that, I think one of the difficulties of having a defense attorney argue at appellate argument who wasn't a trial counsel is that there is possibly a slight change in what actually happened. Certainly, family members testified for Mr. Pardini, Oscar Pardini, the uncle that's supposedly sentenced now to get the auto part, the cousin who supposedly dropped them off. Neither of these individuals, uniquely enough, knew Carla, had ever seen Carla, even – didn't even know that their friend, their cousin, their nephew was even dating anyone, let alone a person called Carla. And what is the inference of that that the government wants to make at the – in front of the jury? That Carla may exist, may actually even be the registered owner of this particular vehicle, but certainly was not a girlfriend of the defendant, certainly was not a person that set her up or set him up. That was what we were saying in front of the jury. I counted, and I may have miscounted, but in the opening argument, the government used the word reasonable 18 times, 18 times to talk about what is reasonable in their particular defense. And in the rebuttal argument, we used it another 8 times, interjected all throughout. We used, or I used, 15 times the word common sense or sense by itself. Does it make sense? This is what we were concentrating on. We weren't trying to lead this jury to say, please, please, Mr. Juror, Mrs. Juror, please place yourself in a position of the defendant trying to invade or somehow violate the Golden Rule. We wanted to say, and what we did say inartfully, probably incorrectly, and that's a pronoun that I, Your Honor, will never use again, the word you, when I'm sitting or standing in front of a jury, to have you believe that I'm talking and trying to get them to place themselves in the defendant's footsteps. What I'm trying to say is, what would one, what would a reasonable person, what would one do in that instance when you suddenly believe, and you're confronted with drugs in the car that you're driving, and then you suddenly put two and two together and say, hey, it must have been my girlfriend that set me up. What would one reasonably do? And this was a term that we bantered in my office for quite a while. My argument, quite frankly, was a reasonable sandwich. We had reasonable 18 times on one end, Carla McElwain in the middle, reasonable and common sense on the other end. We said over and over again, four times, always, always, always, the government has the burden of proving the guilt, I should say, the guilt beyond a reasonable doubt of the defendant. It is never, and we said it over and over again, it is never the defendant's burden to do anything. But when the defendant decides to put on a defense, the government has to have the ability to say why that defense is unreasonable, why his behavior was unreasonable and why this so-called Carla McElwain that is supposedly the brunt of everything in his defense, what caused him to have that car with narcotics in it in the first place, we have to have the ability to say why his rendition of what the facts were in terms of his defense was unreasonable. And that's all the government did there. I'll spend one particular just moment on regarding the remand issue again. If the Court believes, and certainly I understand the Emeline or the modified Emeline case indicates that it is essentially a plain error if the amount of narcotics or the type of narcotics wasn't presented to the jury for a decision. And certainly in this instance, it was not. But I should also say in the same breath, the defendant never contested the type of drug that he was carrying, never even contested the amount of drugs that he was carrying. And certainly if there is any exceptional case in which there would be no reason or no justification or possibly no practical possibility for remand, this should be it. Mr. Viscar Pardini did his 15 months. He was given modifications for his rope. He was given modifications downward for aggregate behavior. He has served his sentence. He has been deported. It's unlikely that he would reappear for resentencing even if this Court had wanted to do so. And certainly I'm not saying that the Court shouldn't do it. I'm not saying that the Court doesn't have the ability to do it. It just doesn't meet with any practical reason to do it. And I'm happy to answer any questions otherwise. Thank you. Thank you. I wasn't there, but I can read. And the witness, the cousin, testified, I want you to talk about a particular evening. Do you remember a particular evening when Mr. Viscar met a girl named Carla? Yes. Were you with him that evening? Yes. And what does Carla look like? Answer, she's a short girl. She's blonde. That's what I remember about her. That's at page 543 of the excerpt of the record. So when government counsel says that we didn't bring in any witnesses that saw Carla, he was there, but the transcript seems to say otherwise. With respect to, you know, the government suggests that the error is not harmless because the government had a different account of the interrogation. That's true. As Judge Wardlaw pointed out, there were some substantial issues as to interpretation. And there's also substantial factual questions here that the jury needs to resolve. Mr. Viscara denied that he changed the story, as Mr. Chang just argued. And that was his argument in trial, and that's a perfectly reasonable argument based on the government's testimony. But Mr. Viscara's testimony was directly opposed to it. So that's an issue for a jury to describe without an improper closing argument getting in the way. With respect to the issue of the reflectors and whatnot, that was disputed as well. And, in fact, the agent who testified that the reflectors were for a particular car, her rough notes, it was pointed out, on cross-examination, didn't say anything about the specific car. It just said a Honda. And that's at page 570 of the excerpt of the record. So there clearly is a question here as to whether or not a verdict would go the other way with a proper closing argument. All right. Thank you, counsel. U.S. v. Viscara-Pardini is submitted. We'll take up U.S. v. Hall. U.S. v. Hall. U.S. v. Hall.
judges: Tashima, Wardlaw, Collins